UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
OFFICE OF THE COMPTROLLER      :
OF THE CURRENCY,            :
                                   :             05 Civ. 5636 (SHS)
               Plaintiff,     :
                                   :
        -against-          :            OPINION AND ORDER
                                   :
ELIOT SPITZER, in his official capacity as     :
Attorney General for the State of New York,    :
                                   :
            Defendant.     :
-------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

       This is an action by the Office of the Comptroller of the Currency (the "OCC") seeking declaratory and injunctive relief barring the Attorney General of the State of New York from infringing on the OCC's exclusive visitorial authority over national banks and their operating subsidiaries.[1] The OCC is the federal agency with primary responsibility for supervising national banks. This litigation was prompted by the Attorney General's investigation into whether the residential mortgage lending practices of several national banks doing business in New York was racially discriminatory. The OCC does not challenge the applicability of the state's anti-discrimination law to national banks' lending practices, nor does it question whether national banks must comply with state fair lending laws. Rather, this action addresses only the question of whether the Attorney General of the State of New York may enforce those laws against national banks.

---

[1] The U.S. Court of Appeals for the Second Circuit recently affirmed the validity of OCC regulations permitting national banks to conduct banking activities through operating subsidiaries and providing that those operating subsidiaries are subject to state laws to the same extent as are national banks. See Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 321 (2d Cir. 2005), petition for cert. filed, No. 05-431 (Sept. 30, 2005); see also 12 C.F.R. § 7.4006. Thus, for simplicity's sake, unless otherwise specified, the Court refers to national banks and their operating subsidiaries collectively as "national banks."

The OCC contends that the Attorney General's assertion of authority pursuant to state law to conduct his investigation and enforce relevant laws is in conflict with, and thus preempted by, section 484 of the National Bank Act, 12 U.S.C. § 484(a), and the OCC's implementing regulation codified at 12 C.F.R. § 7.4000, which gives the OCC exclusive authority to investigate national banks and prosecute enforcement actions to compel their compliance with state and federal laws regulating the content or conduct of federally authorized banking activities. The Attorney General challenges the validity of the OCC's interpretation of section 484, and claims that even if the OCC's regulation is valid, he is authorized to enforce fair lending laws against national banks pursuant to the federal Fair Housing Act, 42 U.S.C. §§ 3601 et seq. The Attorney General also asserts a counterclaim pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A) and (C), that seeks an order setting aside 12 C.F.R. § 7.4000 insofar as it prohibits states from enforcing non-preempted state laws against national banks and their operating subsidiaries.

As explained more fully below, this Court finds that the OCC acted within its statutory authority in promulgating 12 C.F.R § 7.4000; the regulation, as recently amended, reflects a permissible construction of section 484 of the National Bank Act; and the regulation is therefore entitled to deference and, pursuant to the U.S. Supreme Court's decision in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), is to be given "controlling weight." Id. at 844.   The Court also finds that the Attorney General's assertion of visitorial authority impermissibly interferes with the OCC's supervisory role. Accordingly, the OCC's application for declaratory and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure is granted and the Attorney General is permanently enjoined from issuing subpoenas or demanding inspection of the books and records of any

national banks in connection with his investigation into residential lending practices; from instituting any enforcement actions to compel compliance with the Attorney General's already existing informational demands; and from instituting actions in the courts of justice against national banks to enforce state fair lending laws.

This opinion says nothing about whether it is better public policy to vest visitorial powers over national banks in state attorneys general as well as in the OCC. That is a matter for the legislative and executive branches of government to determine. What this opinion does conclude is that the federal statutes, regulations and decisional authority as they now exist compel the conclusion that the New York State Attorney General may not exercise visitorial powers over national banks in connection with an investigation into the banks' residential lending practices.

## Table of Contents

.
I.    Background ........................................................................................................ 4
  A.    Procedural Background........................................................................... 4
  B.    Factual Background ................................................................................ 5
II.   Subject Matter Jurisdiction .............................................................................. 7
III.  The National Banking Statutory and Regulatory Scheme ................................ 8
IV.   Discussion ...................................................................................................... 10
  A.    The Chevron Framework ...................................................................... 11
  B.    No Clear Statement Is Required ........................................................... 12
  C.    Congress Has Not Unambiguously Addressed the Precise Questions at Issue ......... 14
    1.    The Statutory Text Does Not Unambiguously Contravene the OCC's
          Construction of Section 484....................................................................15
    2.    First National Bank in St. Louis v. Missouri Does Not Preclude the OCC's
          Assertion of Exclusive Authority to Enforce State Laws Regulating National
          Banks' Authorized Banking Activities ...................................................17
  D.    The OCC Acted Within Its Authority In Promulgating 12 C.F.R. § 7.4000 ............. 23
  E.    Section 7.4000 Does Not Represent Merely the OCC's Attempt to Distill Statutory
        Terms and Judicial Precedent. ............................................................. 23
  F.    Section 7.4000 Reflects a Permissible Construction of the Statute ............................ 25
    1.    The OCC's Interpretation of "Visitation" is Consistent with the Historical
          Understanding of that Term................................................................27
    2.    Section 7.4000 Interprets Visitorial Powers in a Manner Consistent With the
          Purposes Animating the Enactment of the National Bank Act.............................29

3.  National Fair Lending Policy as Expressed in the Fair Housing Act Does Not Require a Narrower Interpretation of the OCC's Exclusive Visitorial Powers .....32

G.  The OCC's Interpretation of the Courts of Justice Exception Is Also a Permissible Construction of the Statute......................................................................................... 34

1.  The OCC Reasonably Reconsidered Its Earlier Position Reflected in <u>First Union National Bank v. Burke</u>...............................................................................34

2.  The OCC's Interpretation of the Courts of Justice Exception is Consistent with the Statutory Text and the Purpose Underlying the National Bank Act ......................36

V.  The Attorney General's Administrative Procedure Act Counterclaim............................. 38

VI.  Conclusion ..................................................................................................................... 39

## I.  Background

### A.  Procedural Background

On June 16, 2005, the OCC commenced this action by filing a complaint and motion for a preliminary injunction.  On the same day, The Clearing House Association, L.L.C. filed a separate complaint and motion for a temporary restraining order and preliminary injunction seeking a similar order enjoining the Attorney General's investigation and asserting the same grounds for relief.  <u>See</u> <u>The Clearing House Association, L.L.C. v. Spitzer</u>, No. 05 Civ. 5629 (SHS).  Following oral argument four days later, this Court denied the plaintiff's request for a temporary restraining order in <u>The Clearing House Association, L.L.C. v. Spitzer</u>, No. 05 Civ. 5629 (SHS).  The two actions were accepted as related, and the Court subsequently set a coordinated briefing schedule and consolidated the trials on the merits with the hearings on the preliminary injunction applications pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. (Order, dated July 5, 2005).  The trial on the merits was held in both actions on September 7, 2005, at which time argument was heard and affidavits and other exhibits were admitted into evidence. (Transcript, dated Sept. 7, 2005, at 36-37).[2]

---

[2] Various associations and institutions have submitted briefs <u>amici</u> <u>curiae</u> in connection with this and the related action.  The National Community Reinvestment Coalition, together with fifteen other interested organizations; the

### B.    Factual Background

This action arises in response to the Attorney General's investigation into the residential mortgage lending practices of a number of banks doing business in New York State, including several national banks and their operating subsidiaries.  The Attorney General's inquiry began with a review of data made available pursuant to the federal Home Mortgage Disclosure Act, 12 U.S.C. §§ 2801 - 2810, which requires residential real estate lenders to compile certain information regarding their mortgage lending activities and to make that information available to the public.  <u>See</u> 12 U.S.C. § 2803.

Upon a preliminary analysis of 2004 data from several national banks and their mortgage lending operating subsidiaries, Attorney General Spitzer found evidence that he believes shows that differences in the prices of home loans may have been based on the race of the borrower, and concluded that the data was sufficient to establish a <u>prima</u> <u>facie</u> case of race discrimination in violation of federal and state fair lending laws.  (<u>See</u> Declaration of Dennis D. Parker in Supp. of Def.'s Opp to Pls.' Request for Injunctive and Declaratory Relief and in Supp. of Counterclaim, dated August 5, 2005, ("Parker Decl."), at ¶ 5).

In April 2005, the Attorney General sent letters of inquiry to several national banks, including Citibank, N.A., JP Morgan Chase Bank, N.A., HSBC Bank USA, N.A., and Wells Fargo Bank, N.A., informing the banks that he had commenced a preliminary inquiry into each bank's lending practices, advising them that racial disparities in their loan rates "might indicate a violation of state and federal laws prohibiting discrimination in lending," and requesting certain non-public lending information.  (<u>See</u> Parker Decl. at ¶ 6, 7, and Ex. 2; <u>see</u> <u>also</u> Decl. of Grace E.

National Association of Realtors and New York State Association of Realtors, Inc.; the Greenlining Institute; and Thirty State Attorneys General all submitted memoranda opposing the OCC's requested relief. The American Bankers Association, Consumer Bankers Association, and the Financial Services Roundtable jointly submitted a memorandum in support of the OCC.

Dailey, dated June 16, 2005, at ¶ 5).  In the letters to Wells Fargo, HSBC, and JP Morgan Chase, the Attorney General cited New York Executive Law § 296-e and the federal Equal Credit Opportunity Act as potentially applicable anti-discrimination laws.  (See Ex. 2 to Parker Decl.).  The letters requested that "[i]n lieu of issuing a formal subpoena …," the banks "voluntarily provide" certain non-public lending information. (Id.).

The Attorney General asserts the authority to conduct such investigations and bring appropriate enforcement actions pursuant to New York statutory and common law.  Specifically, section 63(12) of the New York Executive Law gives the Attorney General the authority to investigate and prosecute instances of "persistent fraud or illegality in the carrying on, conducting or transaction of business. . . ."  See McKinney's Exec. Law § 63(12).  In furtherance of an inquiry into "persistent fraud or illegality," the Attorney General has the power to issue subpoenas.  See id.

In response to the letters from the Attorney General, the OCC instituted this action on the grounds that the Attorney General's investigation impermissibly intrudes on the OCC's exclusive visitorial authority over national banks.   The Attorney General has reaffirmed his intention to go forward with his investigation and enforcement actions in the event he is not enjoined from doing so.  (See Transcript, dated Sept. 7, 2005, at 38).

In his opposition to the OCC's motion, the Attorney General raised, for the first time, a claim that he may bring enforcement actions against national banks pursuant to the federal Fair Housing Act, (the "FHA"), which he asserts creates a federally authorized exception to section 484's general limitation on states' visitorial powers.  See 12 U.S.C. § 484(a) (limiting the exercise of visitorial powers, "except as authorized by Federal law . . ."). The Attorney General also contends that the FHA reveals an intent by Congress to permit multiple levels of

enforcement of fair lending laws, rendering the OCC's interpretation of section 484 unreasonable insofar as it prohibits states from enforcing fair lending laws. The OCC disagrees with the Attorney General's argument regarding Congressional intent, insisting that its interpretation of section 484 is not in conflict with any policy expressed by the FHA. It also notes that none of the enforcement provisions of the FHA on their face apply to the Attorney General, but the OCC does not seek a determination as to the Attorney General's authority to bring any particular type of action pursuant to the FHA.[3] Accordingly, here, the Court considers only the Attorney General's contention that the national policy expressed in the FHA mandates a reading of the National Bank Act that would permit him to enforce fair lending laws against national banks.[4]

## II. Subject Matter Jurisdiction

This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 because this action arises under the Supremacy Clause of the U.S. Constitution and the National Bank Act. See Fleet Bank Nat'l Ass'n v. Burke, 160 F.3d 883, 892-93 (2d Cir. 1998); see also First Union Nat'l Bank v. Burke, 48 F. Supp. 2d 132, 140 (D. Conn. 1999). Because the OCC is part of the United States Department of Treasury, this Court also has jurisdiction pursuant to 28 U.S.C. § 1345, which provides federal jurisdiction over all actions commenced by an agency of the United States. 28 U.S.C. § 1345; see also 12 U.S.C. § 93(d); Fed. Sav. & Loan Ins. Corp. v. Ticktin, 490 U.S. 82, 85, 109 S. Ct. 1626, 104 L. Ed. 2d 73 (1989).

---

[3] The OCC acknowledges that the FHA authorizes the federal Secretary of Housing and Urban Development and the United States Attorney General to visit and take enforcement actions against national banks. (See OCC's Reply Mem at 10, n.9). It asserts, however, that section 3613 of the FHA, 42 U.S.C. § 3613, which provides a private right of action for aggrieved persons, "by its terms contains no authorization" for the Attorney General's actions. (See id., at 10, n.8). The OCC also notes that the Attorney General is not certified to receive referrals pursuant to section 3610(f) of the FHA, 42 U.S.C. § 3610(f). (Id.).

[4] The plaintiff in the related action seeks an injunction barring the Attorney General from proceeding with an action in his parens patriae capacity pursuant to the FHA, and accordingly, the issue is addressed there.

### III.    The National Banking Statutory and Regulatory Scheme

National banks are created and governed by the National Bank Act, 12 U.S.C. §§ 21 et

seq., originally enacted in 1864.  See Act of June 3, 1864, 38th Cong. ch. 106, 13 Stat. 99.  The

National Bank Act authorizes national banks to engage in various banking activities and "to

exercise . . . all such incidental powers as shall be necessary to carry on the business of banking .

. ." 12 U.S.C. § 24(Seventh).  Additionally, Congress has expressly authorized national banks to

engage in residential lending subject to restrictions and requirements prescribed by the OCC. 12

U.S.C. § 371(a).[5]

"National banks are instrumentalities of the Federal government, created for a public

purpose, and as such necessarily subject to the paramount authority of the United States." Davis

v. Elmira Sav. Bank, 161 U.S. 275, 283, 16 S. Ct. 502, 40 L. Ed. 700 (1896).  They remain

subject to state laws, but only insofar as those laws do not "prevent or significantly interfere with

the national bank's exercise of its powers." Barnett Bank of Marion County v. Nelson, 517 U.S.

25, 33, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996).  Moreover, in order to "prevent inconsistent

or intrusive state regulation from impairing the national system," the National Bank Act

specifically limits states' ability to exercise supervisory authority over national banks.  See

Wachovia Bank, N.A. v. Burke, 414 F.3d 305, 311-12 (2d Cir. 2005) (citing 12 U.S.C. § 484(a)),

petition for cert. filed, No. 05-431 (Sept. 30, 2005).  In the provision at the center of this

litigation – 12 U.S.C. § 484(a) – the National Bank Act provides:

---

[5] Section 371(a) provides that "[a]ny national banking association may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests on real estate, subject to section 1828(o) of this title and such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order." 12 U.S.C. § 371(a).  Section 1828(o) in turn directs federal banking regulators, including the OCC, to promulgate safety and soundness standards applicable to real estate lending.  See 12 U.S.C. § 1828(o).  The regulatory standards promulgated by the OCC governing national banks' real estate lending practices are set forth in 12 C.F.R. 34, Subpart D, Appendix A.

> No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress . . .

12 U.S.C. § 484(a) (referred to as "section 484").  Section 484 as currently codified remains substantially the same as it was when originally enacted 141 years ago. See Act of June 3, 1864, ch. 106, § 54, 13 Stat. 99, 116.[6]

The OCC is the federal agency entrusted with the "primary responsibility for surveillance of 'the business of banking' authorized by § 24 Seventh." NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256, 115 S. Ct. 810, 130 L. Ed. 2d 740 (1995).  The OCC has recently amended its regulation clarifying the scope of section 484's limitation on the exercise of visitorial powers over national banks and the meaning of the exception for those powers vested in the courts of justice.  That OCC regulation is codified in the Code of Federal Regulations at 12 C.F.R. § 7.4000.  In that regulation, the OCC defines "visitation" to include: "(i) [e]xamination of a bank; (ii) [i]nspection of a bank's books and records; (iii) [r]egulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv) [e]nforcing compliance with any applicable federal or state laws concerning those activities." 12 C.F.R. § 7.4000(a)(2)(i)-(iv).  The regulation construes section 484 of the National Bank Act as vesting the OCC with "exclusive visitorial authority with respect to the content and conduct of activities authorized for national banks under Federal law," unless federal law provides otherwise. 12 C.F.R. § 7.4000(a)(3).  Finally, section 7.4000(b)(2) clarifies the "courts of justice" exception to section 484's general limitation on visitorial powers, explaining that:

---

[6] The Act of June 3, 1864 was designated the "National Bank Act" by Act of June 20, 1874, ch. 343, § 1, 18 Stat. 123, 123 (codified at 12 U.S.C. § 38).  The visitorial powers provision was codified together with examination provisions at Section 5240 of the Revised Statutes of the United States in 1875.  It has subsequently been recodified and amended, in 1913 and again most recently in 1982, when section 484(b) was added to provide a narrow exception allowing appropriate state officials to review a bank's records "solely to ensure compliance with applicable State unclaimed property or escheat laws." See 12 U.S.C. § 484(b); see also Garn-St. Germain Depository Institutions Act of 1982, 97 Pub. L. 320, § 412, 96 Stat. 1469, 1521 (1982).

> This exception pertains to the powers inherent in the judiciary and does not grant state or other governmental authorities any right to inspect, superintend, direct, regulate or compel compliance by a national bank with respect to any law, regarding the content or conduct of activities authorized for national banks under Federal law.

12 C.F.R. § 7.4000(b)(2).

As is evident by the plain terms of this regulation, the Attorney General's assertion of authority pursuant to state law to investigate and enforce national banks' compliance with federal or state laws regulating their conduct of residential mortgage lending – in the absence of any exception provided by federal law – is in direct conflict with section 484 as clarified by 12 C.F.R. § 7.4000(a). Section 7.4000(b)(2) prevents the Attorney General from invoking the courts of justice exception to enforce fair lending laws through judicial proceedings. Except insofar as he claims a right to proceed pursuant to the federal Fair Housing Act, the Attorney General does not dispute that 12 C.F.R. § 7.4000 would bar his investigation and threatened enforcement actions. The Attorney General does, however, assert that 12 C.F.R. § 7.4000 represents an impermissible construction of section 484, which, he claims, is to be accorded no deference by this Court.

## IV.    Discussion

Because the Attorney General challenges the OCC's interpretation of section 484 of the National Bank Act as reflected in 12 C.F.R. § 7.4000, a threshold question for the Court is whether the OCC's interpretation should be given deference – indeed, controlling weight – under the familiar framework set forth by the U.S. Supreme Court some two decades ago in Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), and known as the Chevron framework.

A.    The <u>Chevron</u> Framework

Pursuant to the <u>Chevron</u> doctrine, if an implementing agency's regulations are challenged, a court must first inquire whether "the intent of Congress is clear" as to "the precise question at issue." <u>Chevron</u>, 467 U.S. at 842. If Congress has spoken clearly, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Id.</u> at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." <u>Id.</u> at 843. "If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment 'controlling weight.'" <u>NationsBank</u>, 513 U.S. at 257 (quoting <u>Chevron</u>, 467 U.S. at 844). As the Supreme Court has observed,

> It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws.

<u>Clarke v. Secs. Indus. Ass'n</u>, 479 U.S. 388, 403-04, 107 S. Ct. 750, 93 L. Ed. 2d 757 (1987) (quotations and citation omitted). When the OCC implements a provision of the National Bank Act "in accord with the legislature's intent," that interpretation is entitled to deference. <u>See</u> <u>NationsBank</u>, 513 U.S. at 259; <u>see</u> <u>also</u> <u>Wachovia,</u> 414 F.3d at 321. Accordingly, if there is ambiguity in section 484's reference to visitorial powers, or its courts of justice exception, this Court must "give great weight to any reasonable construction" of those terms by the OCC. <u>Clarke</u>, 479 U.S. at 403; <u>see</u> <u>also</u> <u>Wachovia</u>, 414 F.3d at 315.

**B.       No Clear Statement Is Required**

As a preliminary matter, the Court addresses the Attorney General's contention that a

clear statement of Congressional intent to preempt state visitorial power in the manner effected

by 12 C.F.R. § 7.4000 is necessary in order to affirm the validity of that regulation.  The

Attorney General posits that this clear statement is necessary because the OCC's interpretation of

section 484 interferes with the traditional state interest in enforcing its own laws, and in

protecting its citizens from discriminatory conduct. A similar argument was raised in <u>Wachovia</u>

<u>Bank, N.A. v. Burke</u>, 414 F.3d 305 (2d Cir. 2005), and rejected there by the U.S. Court of

Appeals for the Second Circuit.  For the reasons articulated in <u>Wachovia</u>, the argument is equally

unavailing here.

Preemption, which finds its roots in the Supremacy Clause of the U.S. Constitution,

generally occurs in one of three ways:  where Congress expressly preempts state law; where

Congress legislates so comprehensively as to occupy an entire field, leaving no room for state

law; or where federal law conflicts with state law.  <u>See</u> <u>Fid. Fed. Sav. & Loan Ass'n v. De la</u>

<u>Cuesta</u>, 458 U.S. 141, 152-53, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982); <u>see</u> <u>also</u> U.S. Const. art.

VI. cl. 2.  "Federal regulations have no less pre-emptive effect than federal statutes," <u>De la</u>

<u>Cuesta</u>, 458 U.S. at 153, and "federal courts have recognized that the OCC may issue regulations

with preemptive effect." <u>Wachovia</u>, 414 F.3d at 314.  This case, just as <u>Wachovia</u>, involves an

instance of "conflict preemption" that arises where "'state law stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress.'" <u>Wachovia</u>, 414

F.3d at 313-14 (quoting <u>De la Cuesta</u>, 458 U.S. at 153).  As the Supreme Court observed, "'[t]he

relative importance to the State of its own law is not material when there is a conflict with a valid

federal law, for the Framers of our Constitution provided that the federal law must prevail.'" <u>De</u>

la Cuesta, 458 U.S. at 153 (quoting  Free v. Bland, 369 U.S. 663, 666, 82 S. Ct. 1089, 8 L. Ed. 2d 180 (1962)).

In Wachovia, the Second Circuit expressly rejected a claim that a "clear statement" was necessary where OCC regulations purportedly infringed on an area of traditional state authority. The Second Circuit acknowledged that courts will typically apply a presumption against preemption in areas of traditional state authority, but explained that "'[t]he presumption against federal preemption disappears . . . in fields of regulation that have been substantially occupied by federal authority for an extended period of time. Regulation of federally chartered banks is one such area.'"  Wachovia, 414 F.3d at 314 (quoting Flagg v. Yonkers Sav. & Loan Ass'n, 396 F.3d 178, 183 (2d Cir. 2005), cert. denied, --- S. Ct. ----, 73 USLW 3694, 2005 WL 2413929 (Oct. 3, 2005)); see also Wells Fargo Bank N.A. v. Boutris, 419 F.3d 949, 956-57 (9th Cir. 2005).  There is no distinguishing circumstance present here that warrants a departure from the approach the Second Circuit followed in Wachovia just a few months ago.  Accordingly, here, as in Wachovia, the proper focus is "on the reasonableness of the OCC's exercise of its regulatory authority." 414 F.3d at 315.

The Attorney General contends that rather than giving deference to the OCC's own interpretation of section 484, a heightened degree of judicial skepticism should be applied because 12 C.F.R. § 7.4000 represents a jurisdictional "power-grab."  (Def's Mem. of Law in Opp. to Pls.' Request for Declaratory and Injunctive Relief and in Support of Counterclaim, at 34).  Compare Natural Resources Defense Council v. Abraham, 355 F.3d 179, 199 (2d Cir. 2004) (critically viewing agency's attempt to circumvent limitations placed on the exercise of its discretion) with Oklahoma Natural Gas Co. v. FERC, 28 F.3d 1281, 1283-84 (D.C. Cir. 1994) (affording Chevron deference to regulation over objections that it improperly expanded the

agency's jurisdiction). That argument fails as well. Here, the OCC has interpreted undefined terms in its organic statute in order to clarify existing ambiguity and provide certainty to affected parties. This Court can find no valid basis for distinguishing between the effect on the OCC's jurisdictional reach resulting from the amendments to 12 C.F.R. § 7.4000 and that arising from the related operating subsidiary regulations recently affirmed by the Second Circuit in <u>Wachovia</u>. <u>Wachovia</u>, 414 F.3d at 321.[7] Because there is no basis for departing from the traditional <u>Chevron</u> framework, the Court now proceeds with that analysis.

### C.     Congress Has Not Unambiguously Addressed the Precise Questions at Issue

The Court now turns to step one of the <u>Chevron</u> framework: determining whether Congress has addressed the "precise question[s] at issue." <u>Chevron</u>, 467 U.S. at 842.   In making this determination, a court employs the "traditional tools of statutory construction." <u>Chevron</u>, 467 U.S. at 842-43, n.9.  In this analysis, "a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning--or ambiguity--of certain words or phrases may only become evident when placed in context." <u>Food and Drug Admin. v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 132-133, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000).

The precise questions at issue here are (1) whether through section 484's limitation on visitorial powers, Congress intended to preclude state officials from enforcing non-preempted state laws that regulate the conduct of a national bank's federally authorized banking activities; and (2) whether the courts of justice exception was intended to permit state officials to utilize the

---

[7] In response to proposed amendments preceding the OCC's adoption of the operating subsidiary regulations at issue in <u>Wachovia</u>, the OCC received comments opposing its assertion of exclusive authority over those banks, similar to comments received in opposition to the 2004 amendments to 12 C.F.R. § 7.4000. <u>See</u> e.g., Bank Activities and Operations, 69 Fed. Reg. 1895, 1896, 1903 (Jan 13, 2004) (announcing final rule amending visitorial powers provision); Investment Securities; Bank Activities and Operations; Leasing, 66 Fed.Reg. 34,791, 34,788 (July 2, 2001) (announcing final rule providing that operating subsidiaries are subject to state laws to the same extent as national banks).

courts to exercise otherwise prohibited visitorial power over national banks. Although section

484 plainly confines the exercise of visitorial authority over national banks to that authorized by

federal law, and other provisions in the National Bank Act vest the OCC with the primary

supervisory authority over national banks, nowhere does the Act precisely define the scope of the

OCC's exclusive visitorial powers or the reach of the courts of justice exception. See e.g., 12

U.S.C. §§ 93a, 481, 484 and 1818.

The Attorney General raises two central arguments as to why the statute unambiguously

contravenes the OCC's interpretation as reflected in 12 C.F.R. § 7.4000; the first is based on the

text of the original visitorial powers provision, and the second on his reading of the Supreme

Court's decision in First National Bank in St. Louis v. Missouri, 263 U.S. 640, 44 S. Ct. 213, 68

L. Ed. 486 (1924). The Court addresses each in turn.

### 1. The Statutory Text Does Not Unambiguously Contravene the OCC's Construction of Section 484

The Attorney General asserts that when section 484 is read in context, it is evident that

Congress intended that the limitation on visitorial powers would encompass only direct

supervisory authority aimed at ensuring the safety and soundness of national banks, and that

Congress did not intend to preclude state law enforcement officials from enforcing general state

laws that were applicable to national banks.

The Attorney General begins with the word "other" as used in the original visitorial

powers provision, which provided that the national banks "shall not be subject to any other

visitorial powers than such as are authorized by this act, except such as are vested in the several

courts of law and chancery." Act of June 3, 1864, ch. 106, § 54, 13 Stat. at 116 (emphasis

added). He contends that the reference to "other" visitorial powers refers only to those powers

granted to the OCC in the immediately preceding sentences of the original Act, including the powers to examine the affairs of banking associations; to examine their officers and agents; and to make full and detailed reports of the associations' condition. The Attorney General notes that consistent with the original statute, the language of section 484 has been altered only slightly and remains in a subchapter of the National Bank Act entitled, "Bank Examinations." <u>See</u> Subchapter XV, Title 12 of the U.S. Code. The surrounding sections of the subchapter cover specific bank examination matters, including appointment and payment of examiners, special examinations and waivers of examination requirements. 12 U.S.C. §§ 481-483, 485-486. Thus, the Attorney General insists that the limitation on visitorial powers is intended to limit state <u>administrative</u> officials from directly supervising national banks, and is not intended to preclude state officials from enforcing generally applicable state laws, particularly through actions in the courts.

The visitorial powers provision as originally enacted, however, refers not simply to visitorial powers "other" than the ones in the same section, but to visitorial powers "other" than those authorized by "this act." <u>See</u> Act of June 3, 1864, ch. 106, at § 54. The Attorney General's statutory reading ignores a provision in the original Act vesting the OCC with the authority to exercise visitorial powers by bringing judicial proceedings in the courts. <u>See</u> Act of June 3, 1864, ch. 106, § 53, 13 Stat. 110; <u>see also</u> 12 U.S.C. § 93(a). Moreover, section 484 in its current form contains no reference to nearby provisions or to any other specific provisions in the National Bank Act, but states rather simply that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law, [or] vested in the courts of justice," or those exercised or directed by Congress. 12 U.S.C. § 484(a). Thus, the Court does not find any clear intent of Congress reflected in either the original visitorial powers provision, or in its

current form, to refer only to direct supervision and regulation by administrative officials of laws directly touching on concerns about the safety and soundness of the banks.

The Attorney General also posits that the exception for those powers "vested in the courts of justice" speaks for itself, unambiguously permitting state officials to bring enforcement actions in the courts to enforce applicable state or federal laws. Here again, the Court disagrees. Nothing in the text of section 484 or the surrounding provisions indicates that Congress intended the courts of justice exception to preserve the ability of states to enforce laws regulating national banks' activities by instituting judicial proceedings. The statute therefore neither unambiguously requires that the general law enforcement officials of states be permitted to enforce state laws regulating the business of banking, nor unambiguously permits states to bring judicial actions to enforce such laws pursuant to the courts of justice exception.

### 2. First National Bank in St. Louis v. Missouri Does Not Preclude the OCC's Assertion of Exclusive Authority to Enforce State Laws Regulating National Banks' Authorized Banking Activities

The Attorney General asserts that in First National Bank in St. Louis v. Missouri, 263 U.S. 640, 44 S. Ct. 213, 68 L. Ed. 486 (1924), the U.S. Supreme Court conclusively established that states could sue national banks to enforce non-preempted state laws. However, the Attorney General overstates the holding of St. Louis as applied in the current context of national banking regulation.

The first question addressed in St. Louis was whether the National Bank Act permitted national banks to create intrastate branches, and the Court held that it did not. 263 U.S. at 658-59. Because federal law did not permit branches, the Court concluded that a Missouri law prohibiting branches was not preempted and could be enforced against national banks. Id. at 659. The Court also reasoned that because the Missouri law applied, to deny the state the ability

to enforce it would involve "a fallacy made apparent by the mere statement of the proposition, for such power is essentially inherent in the very conception of law." Id. at 660. It further observed that ". . . since the sanction behind [the anti-branching law] is that of the State and not that of the National Government, the power of enforcement must rest with the former and not with the latter." Id. In concluding that the state could enforce its own law, the Court did not limit its holding to the type of enforcement action in that case – a quo warranto action to determine the applicability of the state law and to prohibit the bank from violating it – but stated that "the power of the State to enforce [the state law] being established, the nature of the remedy to be employed is a question for state determination." Id. at 660-61. Seizing on the St. Louis Court's recognition that the state was the only proper party with the authority to enforce the applicable state law, the Attorney General insists that St. Louis conclusively held that section 5241 of the Revised Statutes, the predecessor to section 484, could not limit states' ability to enforce their own non-preempted laws against national banks.

In St. Louis, the national bank was acting entirely outside the powers granted by federal law and engaging in an activity prohibited by a state law. See id. at 659-60. At that time, the OCC had no clear authority to enforce national banks' compliance with applicable state banking laws. The Court recognized that although states generally were precluded from exercising authority over national banks, to fill a gap in the law, the state must be permitted to enforce its own law against national banks. Id. at 660-61. Those circumstances do not exist here.

First, residential mortgage lending is an activity expressly authorized by the federal banking laws, and a national bank's lending activity is regulated and supervised by the OCC. See 12 U.S.C. § 371(a). Unlike Missouri's anti-branching law, New York's anti-discrimination law does not purport to prohibit national banks from engaging in residential mortgage lending, but

rather regulates the conduct of that federally authorized banking activity. Second, in St. Louis, there was no federal enforcement mechanism in place; only the state possessed the authority to enforce the state's anti-branching law. In contrast, here, not only does the state's anti-discrimination law contemplate enforcement by private individuals in private enforcement actions, see McKinney's Exec. Law §§ 296-e, 297, but it is also enforceable by the OCC, which since 1966 has had the authority to compel national banks' compliance with any applicable law regulating the business of banking, state or federal. See 12 U.S.C. §§ 1818(b), (e) and (i)(2), Pub. L. 89-695, section 202, 80 Stat. 1028 (Oct. 16, 1966); see also National State Bank, Elizabeth, N.J. v. Long, 630 F.2d 981, 988 (3d Cir. 1980).

The Attorney General asserts that references to section 5241 in the summaries of arguments provided in the syllabus in front of the actual published decision of the Supreme Court in St. Louis warrant the conclusion that the Supreme Court, sub silentio, conclusively decided that section 484's limitation on visitorial powers unambiguously excludes from its reach a state's authority to enforce its own non-preempted laws that regulate the conduct of a national bank's federally authorized banking activity. But the actual opinion of St. Louis did not mention nor cite section 5241 of the Revised Statutes, making the Attorney General's sweeping assertion about its importance untenable.[8]

---

[8] The OCC insists that even if St. Louis reached a conclusion regarding the scope of states' proper exercise of visitorial powers that differs from the OCC's current construction, it would not foreclose the OCC's new interpretation because St. Louis did not rest on the "unambiguous terms of the statute." See National Cable & Telecommunications Ass'n v. Brand X Internet Services, -- U.S. ---, 125 S. Ct. 2688, 2700, 73 USLW 4659 (Jun. 27, 2005) ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."). Because St. Louis is best understood in light of the statutory framework in place at the time and involved a gap in the law that no longer exists, it does not necessarily stand in conflict with the OCC's interpretation of section 484. To the extent St. Louis is inconsistent with the OCC's modern interpretation of section 484, pursuant to the principle recognized in Brand X, the OCC is not foreclosed from reinterpreting the provision in light of changed circumstances or from clarifying its application in the different situation present here. See Brand X, 125 S. Ct. at 2700.

More recent cases from the U.S. Courts of Appeals from the Third and Ninth Circuits support this Court's conclusion that <u>St. Louis</u> does not foreclose the OCC from interpreting section 484's limitation on visitorial powers to encompass state efforts to enforce non-preempted state laws that regulate the business of banking. In 1980, the U.S. Court of Appeals for the Third Circuit considered the OCC's current construction of section 484 as limiting states' ability to enforce state laws, even when those laws are not substantively preempted by the federal banking laws. <u>See</u> <u>National State Bank, Elizabeth, N.J. v. Long</u>, 630 F.2d 981, 987-88 (3d Cir. 1980).

<u>Long</u> held that while substantive provisions of a New Jersey anti-redlining statute were not preempted by federal banking laws, provisions of the statute requiring banks to compile and disclose statistical information and authorizing the state banking commissioner to investigate, issue subpoenas and cease and desist orders and impose penalties were preempted by section 484. <u>Id.</u> The court recognized that "when state law prohibits the practice of redlining, its enforcement so directly implicates concerns in the banking field that the appropriate federal regulatory agency has jurisdiction." <u>Id.</u> at 988. The Third Circuit also observed that permitting state enforcement of the statute "would result in unnecessary and wasteful duplication of effort on the part of the bank and the state agency. From that standpoint enforcement exclusivity in the federal agency is reasonable and practical." <u>Id.</u> Accordingly, the court explained that "[q]uestions about the applicability of state legislation to national banks must be distinguished from the related inquiry of who is responsible for enforcing national bank compliance." <u>Id.</u> at 987-88.

Although the Third Circuit suggested that the question of "just what 'visitorial' powers include" remained unclear, it concluded that the OCC's interpretation that it had the exclusive power to examine national banks' compliance with state law was "a reasonable interpretation of

the National Bank Act." <u>Long</u>, 630 F.2d at 989. After <u>Long</u>, another court in this district captured this principle, noting that in the context of the dual banking system of national and state banks, "when the states seek to enact laws affecting national banks, they do so subject to the enforcement limitation imposed by Congress for the purpose of protecting against a state's use of its legislative authority to restrict, limit or otherwise penalize national banks." <u>First Union Nat'l Bank v. Burke</u>, 48 F. Supp. 2d 132, 148-49 (D. Conn. 1999).[9]

In August of this year, the U.S. Court of Appeals for the Ninth Circuit similarly found the distinction between "procedural" and "substantive" preemption to be a reasonable one. <u>See Wells Fargo Bank N.A. v. Boutris</u>, 419 F.3d 949, 963-64 (9th Cir. 2005) (characterizing the preemptive effect of section 484 as "entirely procedural, not substantive"). In <u>Wells Fargo</u>, the Ninth Circuit agreed with the OCC that California's banking commissioner could not exercise authority granted by state law to conduct or require audits of national bank operating subsidiaries because that assertion of authority is a form of prohibited visitorial power. <u>Wells Fargo</u>, 419 F.3d at 963-64. The Ninth Circuit observed that although national banks are not governed exclusively by federal laws in their banking business, "[o]ne area of authority over national banks that has historically been the exclusive province of the federal government . . . is the 'visitorial' power." <u>Id.</u> The court explained that "[t]he exclusively federal power to 'visit' national banks is not the power to oust all state regulation of those entities. Instead, the exclusivity of visitorial authority preempts only <u>enforcement</u> of state visitation laws by <u>state officials</u>, subject to the exceptions stated in § 484(a) itself." <u>Id.</u> (emphasis in original) (citing <u>inter alia</u>, <u>Nat'l State Bank, Elizabeth, N.J. v. Long</u>, 630 F.2d 981, 989 (3d Cir.1980)).

---

[9] As discussed in section IV(G), <u>infra</u>, <u>First Union</u>, in <u>dicta</u>, drew a distinction between administrative and judicial enforcement concluding that states could bring judicial enforcement actions pursuant to section 484's courts of justice exception. The OCC has since reconsidered the proper application of the courts of justice exception, concluding that the distinction drawn in <u>First Union</u> contravenes the purposes of the visitorial powers provision. <u>See</u> 48 F. Supp. 2d at 151; <u>see also</u> Bank Activities and Operations, 69 Fed. Reg. 1895, 1900 (Jan. 13, 2004).

To counter the weight of Long, the Attorney General cites several cases that he contends either explicitly or implicitly recognize the right of states to enforce their non-preempted laws against national banks. Each of these cases are inapposite, however as some involve private plaintiffs who do not themselves possess any visitorial authority, see e.g., Guthrie v. Harkness, 199 U.S. 148, 154-55, 26 S. Ct. 4, 50 L. Ed. 130 (1905); others do not implicate the authorized banking activities of national banks, either because information is sought from national banks in furtherance of investigations into other parties, see e.g., Bank of Am. Nat'l Trust & Sav. Ass'n v. Douglas, 105 F.2d 100, 106 (D.C. Cir. 1939), or because the state laws enforced were not ones regulating the content or conduct of federally authorized banking activities. See e.g., State of Minnesota v. Fleet Mortgage Corp., 158 F. Supp. 2d 962, 966 (D. Minn. 2001). Cases that did involve state enforcement of banking related laws did not directly address the visitorial powers provision. See e.g., Brown v. Clarke, 878 F.2d 627 (2d Cir. 1989); New York v. Citibank, 537 F. Supp. 1192 (S.D.N.Y. 1982).

In sum, because Congress has not specifically addressed the precise questions at issue, and because judicial precedent does not foreclose the OCC's construction of section 484, the Court must give deference to the OCC's reasonable construction of those terms. Chevron, 467 U.S. at 843. As explained below, the Court finds that 12 C.F.R. § 7.4000 reflects such a reasonable interpretation.

The Attorney General raises two additional bases for declining to give deference to the OCC's construction of section 484 that the Court now addresses: first, the OCC purportedly acted outside its statutory authority in promulgating 12 C.F.R. § 7.4000 and thus is entitled to no deference; and second, because the OCC merely attempted to distill the meaning of statutory terms and judicial precedent rather than applying agency expertise, there is no basis for applying

the traditional <u>Chevron</u> deference.  Neither assertion provides a basis for denying the deference the OCC is due, but the Court turns now to each.

**D.      The OCC Acted Within Its Authority In Promulgating 12 C.F.R. § 7.4000**

The Attorney General contends that the OCC acted outside its statutory authority when it promulgated 12 C.F.R. § 7.4000 because that regulation is not expressly and directly addressed to safety and soundness concerns.  This cabined reading of the OCC's regulatory authority does not comport with the terms of 12 U.S.C. § 93a, which provides in relevant part, "[e]xcept to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to another regulatory agency, the Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the responsibilities of the office . . ."  The Ninth Circuit recently characterized this provision as a "conferral of regulatory authority [that] is as broad as the OCC's statutory responsibilities, defined piecemeal throughout the Bank Act."  <u>Wells Fargo</u>, 419 F.3d at 958 (citing provisions of the National Bank Act); <u>Wachovia</u>, 414 F.3d at 318 (sustaining OCC authority to promulgate regulations applying 12 C.F.R. § 7.4000 to national bank operating subsidiaries).  As is apparent from its terms, section 93a clearly encompasses the authority to clarify ambiguous terms in section 484.  12 U.S.C. § 93a; <u>see also</u> <u>Wells Fargo</u>, 419 F.3d at 958.

**E.      Section 7.4000 Does Not Represent Merely the OCC's Attempt to Distill Statutory Terms and Judicial Precedent.**

The Attorney General next contends that deference should not be afforded the OCC's regulation interpreting section 484 of the National Bank Act because the regulation represents merely the OCC's attempt at distilling statutory terms and judicial precedent.  A similar argument was made in <u>Wachovia</u>, challenging the application of <u>Chevron</u> deference to 12 C.F.R.

§ 7.4006, the OCC's regulation clarifying that national banks' operating subsidiaries are subject to state laws to the same extent as national banks. See Wachovia, 414 F.3d at 319-20. The OCC had characterized section 7.4006 as clarifying that preemption of state laws as applied to operating subsidiaries "already existed based on the combination of federal statutes and preexisting regulations." Id. at 320 (internal citation omitted). Upon a review of the OCC's discussion of its reasons for promulgating the regulation, however, the Second Circuit was satisfied that the regulation, "at its core, reflects a policy judgment about national banks' use of operating subsidiaries," and therefore accorded it the deference it was due. Id. A similar analysis of the rulemaking record behind the 1999 and 2004 amendments to section 7.4000 reveals that here too, the OCC's construction of the statutory text was informed by its experience as the national banks' primary regulator.

The OCC's discussion in the Federal Register of its reasons behind the 1999 and 2004 amendments to 12 C.F.R. § 7.4000 does include a comprehensive review of the history of the visitorial powers provision, the context in which the national banking system originated, and relevant judicial precedent. At the same time, however, the discussion indicates that the OCC's response to questions regarding the proper application of section 484 was informed by its experience acting as the sole supervisor of the banking activities of national banks in a dual banking system. See e.g., Banking Activities and Operations 69 Fed. Reg. 1895, 1896 (Jan. 13, 2004) (explaining need to clarify terms in section 484 "in order to provide greater certainty to affected parties . . ." and in a manner reflecting Congressional intent to create a uniform system of regulation over national banks subject to exclusive visitorial authority except where otherwise authorized by federal law). The terms of the statute engendered sufficient ambiguity that the OCC felt the need to clarify their application, and particularly in the context of states' use of the

courts of justice exception as a means of exercising otherwise prohibited visitorial powers.  See

Rules, Policies, and Procedures for Corporate Activities; Bank Activities and Operations; Real

Estate Lending and Appraisals, 68 Fed. Reg. 6363, 6367 (Feb. 7, 2003).  In setting forth its

proposed amendments, the OCC described the history and purpose of the National Bank Act as

well as relevant judicial precedent in order to "present the[] proposed changes in context." Id.

The OCC's "interpretation and extrapolation" of the scope of the visitorial powers provision and

its exceptions "is precisely the type of interpretation with which an administrative agency is

charged." Wachovia Bank, N.A. v. Burke, 319 F. Supp. 2d 275, 282 (D. Conn. 2004) aff'd in

part and vacated on other grounds, 414 F.3d 305 (2d Cir. 2005).  Under Chevron, its reasonable

application of that expertise and experience is entitled to deference.

### F.        Section 7.4000 Reflects a Permissible Construction of the Statute

Where, as here, Congress has not addressed the precise questions at issue, and has

delegated authority to the OCC to fill in gaps in the National Bank Act, the Court must

determine, pursuant to step two of Chevron, whether the OCC's regulation "harmonizes with the

language, origins, and purpose of the statute."  Coke v. Long Island Care at Home, Ltd., 376

F.3d 118, 128 (2d Cir. 2004).  If the regulation reflects a permissible construction of the statute

that is not contravened by its text or Congressional intent, it must be given "'controlling

weight.'"  NationsBank, 513 U.S. at 257; see also Wachovia, 414 F.3d at 321.

The OCC's regulation implementing section 484 was first codified as 12 C.F.R. § 7.6025

in 1971, and has been revised a number of times and renumbered to its current codification at 12

C.F.R. § 7.4000.  See 36 Fed. Reg. 17000, 17013 (Aug. 26, 1971) (adopting 12 C.F.R. §

7.6025(b)).[10] In recent amendments promulgated in 1999 and 2004, the OCC has extrapolated on the proper understanding of "visitorial powers" and the courts of justice exception.

In 1999, the OCC proposed amendments to section 7.4000 in order "to clarify the extent of the OCC's visitorial powers under 12 U.S.C. § 484 . . ." See Investment Securities; Rules, Policies, and Procedures for Corporate Activities; and Interpretive Rulings, 64 Fed. Reg. 31749, 31751 (June 14, 1999). The 1999 amendments codified the definition of "visitorial powers" and illustrated the meaning of the term by including a "non-exclusive list" of the OCC's visitorial powers, including: "(i) [e]xamination of a bank; (ii) [i]nspection of a bank's books and records; (iii) [r]egulation and supervision of activities authorized or permitted pursuant to federal banking law; and (iv) [e]nforcing compliance with any applicable federal or state laws concerning those activities." See 12 C.F.R. § 7.4000(a)(2)(i)-(iv) (as amended in 1999); Investment Securities; Rules, Policies, and Procedures for Corporate Activities; Bank Activities and Operations, 64 Fed. Reg. 60092, 60099, 60100 (Nov. 4, 1999) (announcing final rule).

In its February 7, 2003 Notice of Proposed Rulemaking, the OCC acknowledged that questions had arisen regarding the scope of the OCC's visitorial authority over national banks, specifically questions regarding "what activities conducted by a national bank are subject to the OCC's exclusive visitorial powers" and the meaning of the "vested in the courts of justice exception." See Rules, Policies, and Procedures for Corporate Activities; Bank Activities and Operations; Real Estate Lending and Appraisals, 68 Fed. Reg. 6363, 6367 (Feb. 7, 2003). The OCC again proposed revisions to clarify the scope of its exclusive visitorial powers and in its final rule issued in 2004 clarified that, "[u]nless otherwise provided by Federal law, the OCC has

---

[10] See also 60 Fed. Reg. 11924 (Mar. 3, 1995) (notice of proposed rule); 61 Fed. Reg. 4849, 4869 (Feb. 9, 1996) (final rule); 64 Fed. Reg. 31749 (June 14, 1999) (notice of proposed rule); 64 Fed. Reg. 60092, 60099 (Nov. 4, 1999) (final rule); 68 Fed. Reg. 6363 (Feb. 7, 2003) (notice of proposed rule); 69 Fed. Reg. 1895, 1904 (Jan. 13, 2004) (final rule).

exclusive visitorial authority with respect to the content and conduct of activities authorized for national banks under Federal law." 12 C.F.R. § 7.4000(a)(3) (as amended in 2004); <u>see</u> <u>also</u> Bank Activities and Operations, 69 Fed. Reg. 1895, 1904 (Jan. 13, 2004) (announcing final rule). The 2004 amendments also clarified that the courts of justice exception does not permit state officials to exercise otherwise prohibited visitorial powers through the courts. 12 C.F.R. § 7.4000(b)(2) (as amended in 2004); <u>see</u> <u>also</u> 69 Fed. Reg. at 1904.

The Court first turns to the OCC's construction of the scope of the visitorial powers limitation: whether the OCC reasonably concluded that section 484 bars states from enforcing non-preempted state laws that regulate the content and conduct of federally authorized banking activities. Second, the Court addresses whether the OCC's construction of the courts of justice exception is permissible.

### 1. The OCC's Interpretation of "Visitation" is Consistent with the Historical Understanding of that Term

The Supreme Court provided an early explication of the term "visitation" in <u>Guthrie v. Harkness</u>, 199 U.S. 148, 156-57, 26 S. Ct. 4, 50 L. Ed. 130 (1905), in which the Court found a private shareholder's action demanding access to a national banks' books and records was not barred by the National Bank Act's visitorial powers provision, then codified at section 5241 of the Revised Statutes. The Court reviewed definitions of the term "visitation," noting that visitation refers to "the act of examining into the affairs of a corporation," and that "[v]isitors of corporations have power to keep them within the legitimate sphere of their operations, and to correct all abuses of authority, and to nullify all irregular proceedings." <u>Id.</u> at 157-58 (internal quotations and citations omitted). At common law, visitation was understood as a right "exercised by the King as to civil corporations, and as to eleemosynary ones, by the founder or

donor." Id. at 158.  Correspondingly, "[i]n the United States, the legislature is the visitor of all corporations founded by it for public purposes" Id.; see also Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 673-76, 4 L. Ed. 629 (1819) (Story, J., concurring) (explaining visitation at common law).

"Visitation, in law," was defined in First National Bank of Youngstown v. Hughes, 6 F. 737, 740 (6th Cir. 1881), appeal dismissed, 106 U.S. 523 (1883)), as "the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce an observance of its laws and regulations. . . .[meaning] 'inspection; superintendence; direction; regulation.'" See 6 F. at 740-41 (cited in Guthrie, 199 U.S. at 158); see also Peoples Bank v. Williams, 449 F. Supp. 254, 259 (W. D. Va. 1978).

Guthrie and Hughes highlight two important distinctions in understanding the nature of visitorial power.  In Guthrie, the Supreme Court explained that visitation did not include the private right of one of the bank's shareholders to examine the business affairs of the bank as a shareholder; but rather is "a public right, existing in the state for the purpose of examining into the conduct of the corporation with a view to keeping it within its legal powers.  Guthrie, 199 U.S. at 158-59.  In Hughes, a county auditor sought information from a national bank regarding its depositors in the course of his investigation into the depositors' personal tax liabilities.  See Hughes, 6 F. at 738-39.  The court concluded that the auditor's investigation did not constitute visitation for purposes of section 5241 because the auditor did not seek to investigate or supervise the bank, but rather sought information from the bank in furtherance of his investigation of individuals' tax liabilities.  See id. at 740-41.

Each of these distinctions is reflected in the OCC's construction of section 484's limitation on states' visitorial powers.  The OCC's regulation bars states, not private parties,

from enforcing laws against national banks, and it bars states from enforcing only those laws regulating the content and conduct of federally authorized banking activities against national banks.  <u>See</u> 12 C.F.R. § 7.4000.

<u>Guthrie</u> also recognized that in providing in section 5241 that national banks would be free from the exercise of visitorial powers except as specifically provided otherwise,

> Congress had in mind . . . that in other sections of the law it had made full and complete provision for investigation by the Comptroller of the Currency and examiners appointed by him . . . It was the intention that this statute should contain a full code of provisions upon the subject, and that no state law or enactment should undertake to exercise the right of visitation over a national corporation. Except in so far as such corporation was liable to control in the courts of justice, this act was to be the full measure of visitorial power.

<u>Id.</u> at 159.  Consistent with this historical understanding of the nature of visitation, the OCC reasonably defines section 484's limitation on visitorial powers in a manner that encompasses any attempt by states to supervise national banks' compliance with laws governing the conduct of federally authorized banking activities, whether directly or through the courts.

## 2. Section 7.4000 Interprets Visitorial Powers in a Manner Consistent With the Purposes Animating the Enactment of the National Bank Act

The Act of June 3, 1864 provided for the organization of a system of national banking associations, subject to the supervisory authority of the Comptroller of the Currency, and established a uniform and secure national currency that could help stabilize and support the post-Civil War national economy.  <u>See</u> Act of June 3, 1864, ch. 106 §§ 1, 54, 13 Stat. 99, 99, 116; <u>see also</u> <u>Tiffany v. Nat'l Bank of the State of Missouri</u>, 85 U.S. (18 Wall.) 409, 413, 21 L. Ed. 862 (1874).

The creation of this national banking system had followed a period during which state chartered banks proliferated, each issuing its own currency and operating in the absence of any

federal regulation; in the wake of the Civil War, Congress recognized the urgent need for a uniform currency, and it was in this context that Congress enacted the National Currency Act of 1863, which designated the Comptroller of the Currency as the single authority responsible for approving federal charters and regulating all matters relating to the new national currency.  <u>See</u> Act of Feb. 25, 1863, ch. 58, § 1, 12 Stat. 665, 665; <u>see</u> <u>also</u> Cong. Globe, 37th Cong., 3rd Sess. 844 (Feb. 10, 1863) (remarks of Sen. Sherman).  The following year, Congress passed the Act of June 3, 1864 – the National Bank Act – repealing and replacing the National Currency Act.  <u>See</u> Act of June 3, 1864, ch. 106, § 62, 13 Stat. 99.  The Act of 1864 included provisions comprehensively regulating the new national banking associations, providing for reserve requirements; placing limitations on interest rates; and providing for regular examinations by the OCC.  <u>See</u> <u>e.g.</u>, Act of June 3, 1864, ch. 106, §§ 30, 31, 44, 54, 13 Stat. at 108, 112-13, 116.

Essential to the effort of creating a uniform national currency, was creating a system of national banks that would operate according to federal law and supervision, and without the intrusion of potentially unfriendly state regulation.  <u>See</u> <u>Easton v. Iowa</u>, 188 U.S. 220, 229-230, 23 S. Ct. 288, 47 L. Ed. 452 (1903); <u>see also</u> Cong. Globe, 38th Cong., 1st Sess. 1893 (1864) (remarks of Sen. Sumner) (recounting the constitutional principles announced in <u>McCulloch v. Maryland,</u>17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819), and insisting that the new national banking system "must not be subjected to any local government, State or municipal; it must be kept absolutely and exclusively under that Government from which it derives its function").  Although Congress did not entirely preempt state regulation of banking, it limited the exercise of visitorial powers over national banks to those it vested in the OCC, and those vested in the courts.  <u>See</u> Act of June 3, 1864, ch. 106, § 54, 13 Stat. at 116 (codified at 12 U.S.C. § 484).

The OCC drew on this history in its recent clarification of the scope of visitorial powers and the exceptions to its exclusive visitorial authority created by Congress. <u>See</u> 69 Fed. Reg. 1895, at 1898. The OCC has read section 484's limitation on visitorial powers in light of the basic objectives of the National Bank Act: to create a uniform system of national banks, comprehensively and exclusively regulated by federal law. The available legislative history does not contravene the OCC's conclusion that even as states are free to enact legislation substantively governing national banks' banking activity, the enforcement of those laws is properly vested in the OCC, not in state officials. <u>See</u> <u>Coke</u>, 376 F.3d at 127.

This view of the scope of the OCC's exclusive visitorial authority also finds support in a more recently enacted federal banking law, the Riegle Neal Interstate Banking and Branch Efficiency Act of 1994 (the "Riegle Neal Act").

The Riegle-Neal Act, 12 U.S.C. §§ 36, <u>et</u> <u>seq.</u>, amended federal banking laws to permit interstate branches by national banks. Congress provided that those branches would be subject to "[t]he laws of the host State regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches" to the same extent as such state laws apply to state branch banks, except where preempted by federal law or where state laws discriminate against national banks' branches. 12 U.S.C. §§ 36(f)(1)(A),(A)(i), and (A)(ii). At the same time, however, Congress made clear that "[t]he provisions of any State law to which a branch of a national bank is subject under this paragraph shall be enforced, with respect to such branch, by the Comptroller of the Currency." 12 U.S.C. § 36(f)(1)(B).

The OCC views this grant of authority to itself rather than to relevant state officials as evidence that its construction of section 484 is in line with Congressional intent to retain exclusive supervisory authority in the OCC even as states are permitted to enact laws

substantively regulating banking activities. The Attorney General responds by citing legislative history reflecting Congressional intent that the Riegle-Neal Act not be read as altering the balance of federal and state power over national banks' branching activity.[11] But broadly worded concerns about the balance of federal and state power do not defeat the clear import of 12 U.S.C. § 36(f)(1)(B), which vests in the OCC – not the host states – the power to enforce the applicable state laws. By dealing separately with the applicability of state law and the authority to enforce that law, Congress did not alter the balance of state authority over national banks, but rather applied to national banks' interstate branches the same limitations on state visitorial powers as are applicable to national banks themselves. Thus, this Court agrees with the conclusion of the district court in First Union that "[t]he OCC's view of its exclusive administrative enforcement authority for all banking laws, state and federal is consistent with 12 U.S.C. § 36(f)." First Union, 48 F. Supp. 2d at 146.

### 3. National Fair Lending Policy as Expressed in the Fair Housing Act Does Not Require a Narrower Interpretation of the OCC's Exclusive Visitorial Powers

The Attorney General contends that section 484 must be construed in para materia with the federal Fair Housing Act (the "FHA") so as not to undermine Congress' intent to advance the national policy of fair lending by permitting multiple layers of enforcement at federal, state and

---

[11] See H. R. Conf. Rep. No. 103-651, at 53 (1994), reprinted in 1994 U.S.C.C.A.N. 2068, 2074 ("States have a strong interest in the activities and operations of depository institutions doing business within their jurisdictions, regardless of the type of charter an institution holds. In particular, States have a legitimate interest in protecting the rights of their consumers, businesses, and communities. Federal banking agencies . . . play an important role in maintaining the balance of Federal and State law under the dual banking system. Congress does not intend that the Interstate Banking and Branching Efficiency Act of 1994 alter this balance and thereby weaken States' authority to protect the interests of their consumers, businesses, or communities."). Congress addressed the substantive preemption issue in a separate provision, specifically stating that the standards for preemption of a state law were not altered by the Act. See 12 U.S.C. § 36(f)(3). The Act also includes a provision requiring the OCC to report to Congress annually regarding its actions taken in regard to the applicability of state laws. See 12 U.S.C. § 36(f)(1)(C).

local levels.  It is true that the meaning of terms in a broadly worded statute may be narrowed by subsequent acts of Congress "where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand."  See Brown & Williamson, 529 U.S. at 143; see also Cal. Pub. Employees Ret. Sys. V. Worldcom, Inc., 368 F.3d 86, 100 (2d Cir. 2004), cert. denied,125 S. Ct. 862, 160 L. Ed. 2d 824 (2005).  In fact, both parties invoke that principle here. A consideration of the several enforcement provisions in the FHA, however, supports the OCC's argument that Congress did not intend to impliedly alter the application of section 484 in the fair lending context.

While the FHA specifically prohibits discrimination in lending, the Act is not limited to lending practices; rather, it much more broadly aims at eliminating discrimination in housing. See 42 U.S.C. §§ 3601, 3604-3606.  As elucidated in the amicus curiae brief of the American Bankers Association, et al., there is no indication that Congress either expressly or implicitly intended the FHA's several enforcement mechanisms to override the National Bank Act's specific limitation on the exercise of visitorial powers over national banks.  In fact, while the FHA specifically directs the various federal banking regulators, including the OCC, to cooperate with the Secretary of Housing and Urban Development and the United States Attorney General to enforce its provisions, see 42 U.S.C. § 3608(d), none of the various enforcement provisions expressly grants state Attorneys General the power to enforce the law.  See 42 U.S.C. §§ 3610, 3613 and 3614.  Because Congress explicitly addressed the applicability of the FHA to federal banking institutions but did not expressly create an exception to section 484's limitations for state Attorneys General, the Court will not presume that Congress intended to implicitly modify the longstanding limitation on the exercise of visitorial authority over national banks.

In sum, the OCC's construction of section 484 as limiting states' authority to enforce state laws regulating the content or conduct of federally authorized banking activities even where those state laws are not substantively preempted, is a reasonable and permissible construction of the statute and is therefore entitled to deference. See Chevron, 467 U.S. at 844.

**G.     The OCC's Interpretation of the Courts of Justice Exception Is Also a Permissible Construction of the Statute**

The Attorney General also contends that even if his threatened actions are deemed "visitorial," he nevertheless has authority to enforce the state's anti-discrimination law in state or federal court pursuant to the National Bank Act's express exception permitting the exercise of those visitorial powers vested in courts of justice.  Such a reading of the courts of justice exception, however,  is plainly at odds with the OCC's interpretation reflected in 12 C.F.R. § 7.4000(b), and an analysis of the statutory scheme demonstrates that the OCC's interpretation is reasonable and must be afforded deference.

**1.     The OCC Reasonably Reconsidered Its Earlier Position Reflected in First Union National Bank v. Burke**

The OCC acknowledges that its current interpretation of the courts of justice exception is inconsistent with the position it acquiesced to in First Union Nat'l Bank v. Burke, 48 F. Supp. 2d 132, 135 (D. Conn. 1999).  First Union involved the OCC's motion for preliminary injunctive relief enjoining a state banking official from administratively enforcing a state law limiting banks' collection of ATM fees.  Although the banks involved in the case separately sought a determination that the state law did not bar their activities, for the purposes of the OCC's motion, the court assumed that the law applied and proceeded with the question of whether the OCC was likely to prevail on the merits of its claim that section 484 and its implementing regulation

precluded the state banking commissioner from proceeding with pending enforcement actions. See id. at 135-36.  The district court, concluding that the OCC was likely to prevail, issued a preliminary injunction enjoining the state banking commissioner from issuing cease and desist orders.  Id. at 151.  Although no judicial action had been brought or apparently threatened, the court noted that its injunction would not bar the state commissioner from enforcing the statute through the courts. See id.[12]

The Attorney General asserts that First Union is not an aberration, but is consistent with a long history of states enforcing their consumer protection laws against national banks and that the OCC's current interpretation represents a sharp departure from its own long-standing interpretation of the courts of justice exception.  (See Brief Amicus Curiae of State Attorneys General, at 14, n.8 (collecting cases)).  The OCC responds that its amendment, adopted in the wake of First Union, was justified because "[t]he allocation of any supervisory responsibility for the new national banking system to the states would have been inconsistent with [the] need to protect national banks from state interference."  See 69 Fed. Reg. 1895-1900.

To the extent that the OCC's most recent amendment to section 7.4000 marks a departure from its prior interpretation of the courts of justice exception, "the change is not invalidating," if the OCC sufficiently justifies the reasonableness of its current interpretation.  Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs., --- U.S. --, 125 S. Ct. 2688, 2699-2700 (Jun. 27, 2005) ("[I]f the agency adequately explains the reasons for a reversal of policy, 'change is not invalidating, since the whole point of Chevron is to leave the discretion provided

[12] Other district courts have since rejected the distinction drawn by First Union.  See Bank One Delaware, N.A. v. Wilens, No. SACV 03-274, 2003 WL 21703629, at *2 (C.D. Cal. July 7, 2003) (enjoining "private attorney general" action where private party asserted the rights of the general public in action against national bank, concluding that the "courts of justice" exception would not permit judicial enforcement where administrative action could not otherwise be taken); see also Goleta Nat'l Bank v. O'Donnell, 239 F. Supp. 2d 745, 757 (S.D. Ohio 2002) (characterizing a national bank's attempt to distinguish between judicial proceedings and administrative action for purposes of section 484 and 12 C.F.R. § 7.4000 as an argument that "borders on being frivolous," because the statute and regulation "prohibit regulation by state officials regardless of the form of the enforcement action").

by the ambiguities of a statute with the implementing agency'") (quoting <u>Smiley v. Citibank</u> <u>(South Dakota), N. A.</u>, 517 U.S. 735, 742, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996)).  The question for this Court, therefore, is whether the OCC's current construction of the courts of justice exception as found in section 7.4000 is reasonable.

> **2.      The OCC's Interpretation of the Courts of Justice Exception is Consistent with the Statutory Text and the Purpose Underlying the National Bank Act**

The OCC reasons that the courts of justice exception is best understood as permitting courts to exercise visitation over national banks in actions – like the one at issue in <u>Guthrie</u> – that do not otherwise constitute an attempt to exercise prohibited visitorial authority.   The OCC explained in the preamble to the 2004 amendments to 12 C.F.R. § 7.4000: "[b]ecause in 1864, the primary procedure for the exercise of visitorial powers was through an action in court, it would have made little sense for Congress to have created an exception that was nearly coterminous with the prohibitory rule."  <u>See</u> 69 Fed. Reg. at 1899-1900.  In <u>Guthrie</u>, the Supreme Court recognized that "[t]he visitation of civil corporations is by the government itself, through the medium of the courts of justice."  <u>See</u> <u>Guthrie</u>, 199 U.S. at 197.  It also recognized that the exercise of judicial power itself is a form of visitation, and that power is what Congress excepted from the general limitation of visitation over national banks.  <u>See</u> <u>id.</u> at 158-59.

<u>Guthrie</u> does not stand for the proposition that the courts of justice exception must be read to permit states to use judicial remedies to enforce applicable state laws. The <u>Guthrie</u> court noted that the predecessor to section 484 did not intend to extinguish the right of a shareholder to bring an action to compel access to a bank's books and records, explaining,

> If the right to compel the inspection of books was a well-recognized common law remedy, as we have no doubt it was, even if included in visitorial powers as the

> terms are used in the statute, it would belong to that class 'vested in courts of
> justice' which are expressly excepted from the inhibition of the statute.

Guthrie, 199 U.S. at 158-59. The Supreme Court was simply acknowledging that the exercise of

judicial power to compel production of books is itself an act of visitation, properly exercised in

actions by private individuals. Guthrie does not, however, support the very different proposition

that a state – prohibited from exercising its own visitorial powers directly against a bank – may

use the courts as a medium for doing so. Guthrie noted the distinction between private actions

and the assertion of a superior, sovereign authority to enforce compliance with applicable laws.

Id. The OCC's most recent amendment to section 7.4000 draws this same distinction, and is

therefore reasonable.

Moreover, as the OCC points out, the Attorney General's broad interpretation of the

courts of justice exception is in contrast to the other exceptions in section 484(a) and 484(b),

each of which is narrowly drawn. See 12 U.S.C. §§ 484(a) and (b). Section 484(a) carves out

the additional exception for powers "such as shall be, or have been exercised or directed by

Congress or by either House thereof or by any committee of Congress or of either House duly

authorized," 12 U.S.C. § 484(a), while section 484(b) permits "lawfully authorized State auditors

and examiners" to "at reasonable times and upon reasonable notice to a bank, review its records

solely to ensure compliance with applicable State unclaimed property or escheat laws upon

reasonable cause to believe that the bank has failed to comply with such laws." 12 U.S.C. §

484(b). The OCC's clarification of the courts of justice exception is consistent with these other

exceptions in reflecting a narrowly drawn exception to the otherwise broad preclusion of states'

visitorial authority.

The OCC's interpretation of the courts of justice exception, "preserves the powers that

are inherent in the courts" and gives effect to Congressional intent to preclude state authorities

from exercising visitorial authority over national banks. <u>See</u> 69 Fed. Reg. at 1900. The OCC

has reasonably concluded that the exception should not be read in a manner that would swallow

the rule against state visitation by permitting state officials to circumvent the limits on their

visitorial powers by invoking the power of the courts. The OCC's regulation thus reflects a

permissible construction of the statute, and accordingly is entitled to deference. <u>See</u>

<u>NationsBank</u>, 513 U.S. at 262; <u>Chevron</u>, 467 U.S., at 842. With respect to policy concerns raised

by the Attorney General, "[t]he states' proper recourse at this point is to Congress. [The Court]

must defer to the OCC's authorized and reasonable implementation of the NBA." <u>Wachovia</u>, 414

F.3d at 321.


**V.      The Attorney General's Administrative Procedure Act Counterclaim**

The Attorney General's counterclaim seeking an order setting aside 12 C.F.R. § 7.4000

pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C), fails for the reasons

set forth above.

Pursuant to section 706 of the Administrative Procedure Act, a district court may "hold

unlawful and set aside agency action," where that action is found to be, "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A) and (C).

In support of his counterclaim, the Attorney General reasserts the arguments already raised to

prove the OCC's interpretation to be contrary to law, outside the OCC's statutory jurisdiction

and authority, and an unreasonable construction of section 484. For the reasons detailed above,

these arguments are unavailing.

The Attorney General also fails to show the OCC's regulation to be arbitrary and capricious. "[T]he scope of judicial review under this standard is narrow and deferential." Henley v. Food and Drug Admin., 77 F.3d 616, 620 (2d Cir. 1996). So long as the reviewing court is certain "that an agency has considered all the important aspects of the issue and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made," the judgment of the agency must be affirmed. Id.

The OCC solicited comments and responded to concerns – including many of those asserted here – and reached a reasonable conclusion regarding the proper construction of section 484's limitation on visitorial powers and the courts of justice exception. See 69 Fed. Reg. at 1896. "Where, as here, an agency's determination cannot be characterized as arbitrary, capricious, an abuse of discretion, or contrary to law, the [Administrative Procedure Act] precludes [this Court] from substituting [its] judgment for that of the agency." Henley, 77 F.3d at 621. Because the OCC acted within its jurisdiction and statutory authority in promulgating 12 C.F.R. § 7.4000, and because section 7.4000 reflects a reasoned approach to preempting state enforcement of banking related laws and is not in conflict with the statute or relevant judicial precedent, the Attorney General's counterclaim fails.

## VI.     Conclusion

Because 12 C.F.R § 7.4000 is a reasonable interpretation of the National Bank Act, and because the Attorney General's investigation into national banks' residential mortgage lending activities is prohibited by that regulation, the OCC is entitled to a declaratory judgment that: (1) the Attorney General of the State of New York cannot enforce state fair lending laws against national banks or their operating subsidiaries; (2) the Attorney General cannot compel

compliance with a state investigation into potential violations in connection with the residential mortgage lending practices of those banks except as authorized by federal law; and (3) the courts of justice exception to section 484 does not provide an exception permitting the Attorney General to enforce state or federal fair lending laws through judicial actions.

Because the Attorney General's assertion of visitorial authority impermissibly interferes with the OCC's exclusive supervisory role, the OCC's application for injunctive relief pursuant to Fed. R. Civ. P. 65 is granted. The Attorney General for the State of New York, and all those acting under his direction or in concert with him, are permanently enjoined from issuing subpoenas or demanding inspection of the books and records of any national banks in connection with his investigation into residential lending practices; from instituting any enforcement actions to compel compliance with the Attorney General's already existing informational demands; and from instituting actions in the courts of justice against national banks to enforce state fair lending laws.

Dated: New York, New York
October 12, 2005

SO ORDERED:

Sidney H. Stein, U.S.D.J.